**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Dr. Deborah Holder** | ) | |
| | ) | **CASE NO.  5:14-cv-00435** |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Judge Sara Lioi** |
| **Children's Hospital** | ) | |
| **Medical Center of Akron** | ) | **Magistrate Judge Kathleen B. Burke** |
| | ) | |
| **Defendant** | ) | |

---

## Plaintiff Dr. Deborah Holder's Opposition to Defendant Children's Hospital Medical Center's Partial Motion for Summary Judgment

---

**Preliminary Statement**

Dr. Holder was qualified to build a surgical epilepsy program with an epilepsy monitoring unit at Children's Hospital Medical Center of Akron (CHMCA), which is the job she was hired to do. General neurology service call (GN Call) at night was a function of her job, but not an essential one. Asking for an accommodation with respect to GN Call did not make her unqualified as a pediatric epileptologist. Further, making Dr. Holder find volunteers to cover her GN Call at night was not a reasonable accommodation, since she was already free to do that without an accommodation, and it ultimately left her responsible for GN Call if no one signed up.

CHMCA placed Dr. Holder in a false light that would be highly offensive to reasonable people. CHMCA portrayed Dr. Holder as a physician who could not work with others, needed

professional help, could not practice medicine safely, and was unable to practice due to a

prolonged illness. CHMCA publicized this to executive leadership, Dr. Holder's co-workers, her

patients, their families, members of the national medical epilepsy community and Dr. Holder's

past and current employers. CHMCA did so knowing the statements were false, or in reckless

disregard of their falsity, and a reasonable jury can find in Dr. Holder's favor on her claim of

false light invasion of privacy.

CHMCA also breached its obligation to provide promised personnel, particularly nurse

practitioner support, which caused and contributed to her harm, and it breached its contractual

obligations to notify Dr. Holder's patients of her termination and to comply with the laws

prohibiting disability discrimination and retaliation. For these reasons, Dr. Holder respectfully

requests the Court to deny CHMCA's Partial Motion for Summary Judgment in its entirety.

**Facts**

Dr. Deborah Holder is a leading, board certified, Pediatric Neurologist and

Epileptologist. (Holder at 13; Holder aff. ¶ 2; Doc 39.3 at 1-9).[1] She has extensive experience in

the treatment of children with epilepsy, especially surgical treatments. (Holder aff. ¶ 3; Holder at

19). Dr. Holder is "very talented," highly productive, "golden" with patients and a "phenomenal"

doctor. (Doc. 39-6 pg. 12; Cohen at 71; Considine at 61).[2] Dr. Holder's main nemesis, the

powerful Director of CHMCA's NeuroDevelopmental Science Center (NDSC), Dr. Hudgins,

described Dr. Holder as "incredibly smart and talented" and a "great epileptologist." (Hudgins at

---

[1] Citations to "[Last name] at [page number]" refer to the pages in the deposition transcript of the named individual. For example, "Holder at 13" refers to page 13 of Dr. Deborah Holder's deposition transcript. Dr. Holder's deposition transcript was electronically filed with the Court as Document 39-2. Citations to "Holder Aff." refer to that paragraph of the affidavit of Dr. Holder, filed as Doc. 43-1. Citations to "Doc. [number] at pg. [number]" refer to document number in the docket of this matter. For example, "Doc. 39-3 at 1-9" refers to Dr. Holders curriculum vitae, at pages 1-9 of Document 39-3.

[2] Dr. Cohen's deposition transcript is filed as Doc. 39-6. Mr. Considine's transcript is filed as Doc. 43-2.

125-26).[3]  Dr. Holder's leadership and colleagues describe Dr. Holder as pleasant, professional, polite, respectful, normal, appropriate in her personal interactions and a mentor, colleague and friend. (Cohen at 55, 101, 113,197; Lyden at 18; Considine at 14, Boyd at 37-38; Brown at 16).[4]

CHMCA hired Dr. Holder to build a surgical epilepsy program. (Doc. 39-3 pgs. 15, 23; Hudgins at 126; Cohen at 62; Schwoeble at 137).[5] Dr. Holder's Employment Agreement required her to develop a Business Plan for a surgical epilepsy program, and tied her first year bonus to doing so. (Doc. 39–3 pgs. 15 and 29).  For its part, CHMCA agreed that it "**shall** use all commercially reasonable efforts to implement such Business Plan (Doc. 39–3 pg. 15; emphasis added). Dr. Holder prepared the Business Plan and CHMCA approved it. (Hudgins at 27). Although CHMCA did not provide promised personnel, Dr. Holder's team implemented the Plan with great success.

The Epilepsy Monitoring unit was up and running in March of 2012 (Gavriloff at 92). It met all expectations. When it opened, CEO and President Bill Considine praised Dr. Holder's leadership and for "bring(ing) enormous talent to the families we are privileged to serve." (Exhibit A to Dr. Holder's R. 26 Vol. Disclosures, Doc. 43-6, pg. 92).[6] Surgical epilepsy patients arrived "early on." (Cohen 44-45). The surgical epilepsy program met all expectations. (Hudgins at 20, 22; Cohen at 102, "patients (were) flowing into the EMU," and it "provide(d) patients for our neurosurgeons to operate on.") (Holder aff. at ¶ 4; Cohen 121-122; Doc. 43-7 pgs. 6-7).

---

[3] Dr. Hudgins' deposition transcript if filed as Doc. 43-3.
[4] Mr. Lyden's deposition transcript is filed as Doc. 43-3 and Ms. Boyd's is filed as Doc. 43-4, and Dr. Brown's is filed as Doc. 39-8.
[5] Mr. Schwoeble's deposition transcript is filed as Doc. 39.10.
[6] The documents that Dr. Holder produced pursuant to Rule 26 are filed as Doc. 43-6.

**CHMCA did not Provide Promised Personnel**

Dr. Holder's Business Plan called for a dedicated "mid-level provider" (i.e., nurse practitioner or "NP") to "coordinate the surgery program," and "round on the patients; help with daily notes and discharge summaries." (Doc. 39-3 pg. 37).The nurse practitioner initially provided by CHMCA resigned shortly after the EMU opened, and CHMCA did not replace her for five months. (Holder 38-40; Hudgins 113-14). As a result, Dr. Holder and Dr. Brown performed nurse practitioner duties on top of their surgical epileptologist functions. (Doc. 39-6 pg. 31; Cohen at 147; Hudgins 108, 116; Holder at 176-77).

Dr. Holder's Business Plan also called for the 7100 floor "nurse practitioners (to) provide first call over the EMU." (Cohen at 48; Holder at 151-52). Dr. Holder worked on a plan for the floor NPs to take first call at night. (Doc. 39-7 pg. 23). CHMCA did not implement it, though, until six or seven months after the EMU opened. (Cohen at 48, Holder at 206). Finally, Dr. Holder and Dr. Brown had to cover the EMU once surgical patients arrived to attend them safely, especially during the startup phase. (*Id.*; Ex. 4 pgs. 5-6; Cohen 44-45; Holder 54-56, 61; Brown at 65-66). As a result, for six of the seven months after the EMU opened, Dr. Holder was performing "continuous intern type work on 7100 (with) no NP coverage at night and possible call discrepancies in relation to the other neurologists." (Doc. 39-7 pg.31; Cohen at 48, 146; Hudgins at 104-05, 112).

**Dr. Holder has Juvenile Myoclonic Epilepsy.**

Dr. Holder was diagnosed with Juvenile Myoclonic Epilepsy (JME) when she was in medical school. (Holder at 92, Dr. Schaefer Clinic Notes at pg. 68, filed as Doc. 43-8). At the time of her initial diagnosis in 1990, Dr. Holder's primary symptom was myoclonic jerks, or brief seizures that cause a sudden, quick jerk, primarily in her arms. (Holder aff. ¶ 14). Dr.

Holder later had generalized tonic clonic seizures, which can result in loss of consciousness, generalized stiffening of the body, and generalized shaking following the body stiffness. (Holder aff. ¶ 15; Holder 93-94; Doc. 43-8 pg. 68). With "proper medical management and consistent sleep," though, Dr. Holder "avoided major issues." (Doc. 39-7 pg. 2). She "could wake up occasionally at night; that was no big deal." (Cohen at 49). Since she "always worked at hospitals with Neuro residents," they took general service "first call," which "greatly reduced the number of calls an attending received." (Holder aff. ¶ 18; Doc 39-7 pg. 4). In Pittsburgh, for instance, Dr. Holder "got called rarely during the night." (Doc. 43-8 pg. 69). CHMCA, though, did not employ neurology residents. (Holder aff. ¶ 20; Doc. 39-7 pg. 2; Doc. 43-8 pg. 69 "no residents."). First call at CHMCA went to the general service neurologist taking call, who could "get woke up at midnight, 1, 2, 3, 4, 5, 6." (Cohen at 123; Holder at 99). The first night Dr. Holder took general neurology call at CHMCA, she too "woke up every hour all night long." (Doc. 43-8 pg. 69).

**Dr. Holder asked not to Cover GN Call at Night as an Accommodation**

Dr. Holder "did not anticipate how high the call volume overnight" would be. (Doc. 39-7 pg. 4). After discovering that general neurology interruptions all night long were "typical," Dr. Holder disclosed to Dr. Cohen that she had JME and that "interruptions to her sleep aggravated it." (Holder at 107-110; Cohen at 205). Dr. Cohen said he would find "a way so (Dr. Holder) did not have to be up all night" for general call service. ("GN call") (Holder at 110). Dr. Cohen recommended modifying her general service schedule so Dr. Holder would "have full service responsibility and handle all calls until 11 p.m." (Doc. 39-7 pgs. 2, 8 and 14; Cohen at 208-210). After that, the "rest of us will cover (Dr. Holder's) 11 p.m. to 8 a.m. calls equally." (*Id.*) Dr. Cohen also "increase(ed) (Dr. Holder's) weekend call," which was acceptable to Dr. Holder.

5

(Doc. 39-7 pgs. 2, 8 and 14; Holder aff. ¶ 25). He did not tell Dr. Holder she could **not** to cover the EMU at night, and Dr. Holder did not ask for anyone to cover the EMU at night for her, as EMU call did not involve frequent interruptions to sleep. (Holder aff. ¶¶ 26-28; Hudgins at 121-122).

Dr. Cohen wanted to tell the other neurologists about Dr. Holder's JME, but Dr. Holder asked him not to do so. (Doc. 39-7 pgs.1 and 5).  Dr. Cohen passed Dr. Holder's request for an accommodation on to Walt Schwoeble, Vice President of Human Resources, and to Dr. Hudgins, Dr. Cohen's boss. (Doc. 39-7 pgs. 5-6). Mr. Schwoeble responded that "we need to reasonably accommodate her condition" and, "admirably you have mapped out a great approach."  (*Id.*). Mr. Schwoeble shared Dr. Holder's concern "about the level of disclosure of sensitive information," though, and counseled against "disclos(ing) her condition." (Doc. 39-7 pg. 9). Instead, Mr. Schwoeble told Dr. Cohen to say "only that circumstance have presented themselves that have taken us to the point where we need to accommodate an unfortunate situation that will affect the call process. . . ." (Doc. 39-7 pg. 11). Dr. Cohen replied that he would "do what you suggest and wordsmith the message." (*Id.*).

**CHMCA did not provide the Reasonable Accommodation**

Dr. Cohen did not wordsmith or send the message. (Doc. 39-7 pg. 13). May 2012 came and Dr. Holder was still on the general service schedule at night. (Ex. 37; Holder at 140-411). Dr. Holder scheduled an appointment with Mr. Schwoeble. (Holder aff. ¶ 32; Doc. 39-7 pg. 13) Before their meeting, Mr. Schwoeble asked Dr. Cohen for an update, and to confirm "that we took her off night call(.)" (Doc. 39-7 pg. 13). Dr. Cohen replied apologetically that he "missed this memo. My letter was never sent . . . ." (*Id.*).  Mr. Schwoeble again instructed Dr. Cohen to use specific language to describe the circumstances. When he met with Dr. Holder, he assured

her the hospital would provide the accommodation she requested and that, unless she heard otherwise, everything was taken care of. (Doc. 39-7 pg. 20; Holder aff. ¶ 33).

Dr. Cohen put Mr. Schwoeble's language into the message, but he took out the accommodation. Dr. Cohen decided **not to take Dr. Holder off the schedule at night,** and he **did not assign** her nights to other neurologists equally. (Cohen at 226-28; Holder at 138.) Instead, Dr. Cohen left Dr. Holder on the schedule and asked for volunteers to sign up to cover for her at night. (Cohen at 237-241; Doc. 39-7 pg. 23, "ask(ing) that we all sign up to cover these . . . ."). This left Dr. Holder responsible for finding volunteers to cover for her and made her a target for ridicule, scorn and resentment. (Holder Aff. ¶¶ 34-35); Holder at145, 248-249; Donahue at 114 – 126; Doc. 43-20 pg. 1, ("she isn't to take night call anymore . . . . BABY!)).[7]

**CHMCA falsely portrayed Dr. Holder as a Chronic Complainer who needed Professional Help**

On July 23, 2012 Carrie Gavriloff sent a "Heads Up" email to Dr. Hudgins, Meredith Slosberg, and Craig McGhee. (Doc. 43-7 pg. 9). Ms. Gavriloff, the NDSC Administrative Director, worked closely with Dr. Hudgins and reported to Meredith Slosberg, the Administrative Vice President supporting the NDSC. (Lyden at 53).

Ms. Gavriloff wanted everyone to know that Dr. Holder was "going to speak to Shawn Lyden," CHMCA's Executive Vice President, who was both Dr. Hudgins' and Ms. Slosberg's superior, about Dr. Holder's belief that "Radiology and PICU physicians are incompetent, unsafe and are putting the hospital at risk." (Doc. 43-7 pg. 9). These concerns were valid. (Lyden at 78; Doc. 43-11 pg. 1; Hudgins at 157, 167; Holder at 265). Radiology and PICU physicians had

---

[7] Theresa Donahue's deposition is filed as document 43-19.

missed a stroke diagnosis, and failed to notify neurology when the patient deteriorated, resulting in the patient's paralysis. (Holder aff. ¶ 36).

When Dr. Hudgins got the "Head's up," he emailed Mr. Lyden that Dr. Holder was:

creating a difficult work environment. For Debbie, every day there is a "crisis". Today it was that she had a clinic inadvertently scheduled for her in Boardman. This generates an exaggerated response of anger, threats of quitting, and criticisms of the front office staff and her secretary. Literally every day she is in my office or Carrie's or Bruce's with a laundry list of issues that, to her telling, impede her from delivering good care. She will be in your office tomorrow, Shawn. Of course, some of what she is upset about is real, but for the most part these are the things that happen in every work place."

(Doc. 43-12 pg. 61).  This is complete fiction. Dr. Holder categorically denies responding to every day problems in an exaggerated way. (Holder aff. ¶ 39). She, Ms. Gavriloff and Dr. Hudgins admit that Dr. Holder was not in one of their offices "literally every day." (*Id*. Gavriloff at 152; Hudgins at 161). Dr. Hudgins also admitted i) there was not a crisis with Dr. Holder every day, ii) he did not know whether Dr. Holder had in fact responded with exaggerated anger to a scheduling matter, iii) he could not recall where the information came from, and iv) he did not know if it was true. (Hudgins at 159-61). And physician negligence is not, one hopes, a routine workplace occurrence.

Mr. Lyden did not think that Dr. Holder's conduct, as falsely portrayed in Dr. Hudgins' email, was appropriate. (Lyden at 47). It troubled him that Dr. Holder would say there were problems with patient care if, in fact, there were none. (Lyden at 49-50). Mr. Lyden testified that Dr. Holder presented her concerns about Radiology and the PICU to him in a professional and appropriate way, and that they were legitimate concerns. (Lyden at 18, 78). Even so, Executive VP Lyden had no recollection of doing anything to address them. (Lyden at 79-80).

8

One week later, Dr. Hudgins asked Ms. Gavriloff to help him "remember some of the issues" involving Dr. Holder. (Gavriloff at 50, 52-53, 60). That night, Ms. Gavriloff sent Dr. Hudgins a list of all of the issues she that she could remember, "good, bad or indifferent." (*Id.*; Ex. 9 at 32).[8] There were six. (Doc. 43-12 at 35). Ms. Gavriloff testified two were either good or indifferent (i.e., number 1 "may have been valid" and number 4 was "appropriate"; Gavriloff at 59, 103). Ms. Gavriloff discounted a third, since the source had previously said "something bad about Dr. Holder that wasn't true." (Gavriloff at 69, 73, 74).

Ms. Gavriloff reported as two of the issues that Dr. Holder "indicated" to others that Ms. Gavriloff and Dr. Cohen were not competent. (Doc. 43-12 pg. 35). Ms. Gavriloff admitted that she did not know if Dr. Holder actually thought that about her or whether Dr. Holder in fact used the word "incompetent" to describe them. (Gavriloff at 79, 80-82, 105-06). Sixth and last, Ms. Gavriloff said she heard someone say that Dr. Holder called that front desk staff "idiots" for using an old phone list. Ms. Gavriloff did not know who she heard that from. She also admitted that Dr. Holder had actually made a polite, personal plea to replace an old phone list, because she kept getting calls for "Donna." (Doc. 43-12 pg. 20; Gavriloff at 109, 111-114).

Without any first-hand information that Dr. Holder had inappropriate outbursts towards staff or called anyone names, Dr. Hudgins summoned Dr. Holder into his office on August 3, 2012 where he demanded that she "cease and desist" such outbursts, name calling and appearing unhappy. (Doc. 43-7 pgs. 43-43; Hudgins at 16-17).  Dr. Hudgins made Dr. Holder cry "through most of the conversation." (Doc. 39-7 pg. 31; Hudgins at 47). When Dr. Holder tried to protest

---

[8]       Ms. Gavriloff wrote that "this is all I could think of tonight." (Doc. 43-12 pg. 35). At her deposition, Ms. Gavriloff admitted she could not think of any other issues with Dr. Holder since then (Gavriloff dep. 110-11, 115).

that she had not had outbursts or called anyone names, Dr. Hudgins silenced her with "this is my shop, what I say goes." (Holder aff. ¶ 46).

Afterwards, Dr. Hudgins published an email to Dr. Cohen, Ms. Slosberg, Mr. McGhee, Ms. Gavriloff and, in addition, Karen Henry, a workplace coach with whom Dr. Hudgins ordered Dr. Holder to consult. (Doc. 39-7 pg. 31). He described Dr. Holder's behavior as "bad" and portrayed her as:

> a volcano of internal strife (who) needs help. As you do, Bruce, I believe she needs professional help to allow her to address whatever is eating at her. * * * She is troubled and needs help. Let's fix the above external issues and with Karen's help and others, help her come to grips with her internal problems.

(Doc. 39-7 pg. 31). Ironically, the "external issues" that Dr. Hudgins referenced where CHMCA's failures to provide a dedicated nurse practitioner to the Epilepsy program, and its failure to cover the EMU at night with floor NP first call, per Dr. Holder's business plan. (*Id*).

### CHMCA Falsely Portrayed Dr. Holder as an Unsafe Physician

On August 6, 2012, Dr. Holder reported to Drs. Cohen and Dr. Hudgins that the lack of a dedicated nurse practitioner, the lack of floor NP coverage at night, and the responsibility that she and Dr. Brown shared for attending surgical EMU patient were too much for her. (Dr. Holder aff. ¶ 47; Doc. 43-6 pg. 94).  Dr. Hudgins responded by scolding Dr. Holder for "piss(ing) off" a "number of people," and copied Dr. Cohen on the email. (Doc. 43-6 pg. 94)

Meanwhile, Dr. Holder met with Ms. Henry. Ms. Henry assured Dr. Holder she would keep their conversation confidential. (Doc. 43-12 pg. 61). Afterwards, at 11:44 a.m., Ms. Henry thanked Dr. Holder for trusting her. (Doc. 43-12 pg. 70). At 11:51 a.m., Ms. Henry published a report of her confidential conversation with Dr. Holder to Dr. Hudgins, Dr. Cohen, Ms. Slosberg

and Ms. Gavriloff in which she portrayed Dr. Holder as "blind to her role" and unable to "hear herself." (Doc. 39-7 pg. 68).

On August 13, 2012, Ms. Henry told Dr. Holder that her request not to cover general neurology service at night now required a letter from her doctor. (Doc. 43-12 pg. 70; Holder at 160). Dr. Holder promptly sent one to Employee Health, but did not know if Employee Health received it (Doc. 43-12 pgs. 77, 83). Dr. Holder had severe migraine headaches at this time, and had asked for help so she could receive treatment. (Holder at 165-166; Doc. 43-6 pg. 95). None came. On August 16, 2012, Dr. Holder therefore called Employee Health, left a voice mail message, and later spoke with Employee Health nurse Teresa Hedrick and Disability Specialist Carla Boyd. (Holder at 170-181; Doc. 43-12 pg. 83; Doc. 43-13 pg. 1).

Although Dr. Holder sounded highly upset in her voice mail and these conversations, she was not "out of control." (Boyd at 22, 36) ("No, I really wanted to help her, just whatever I could do to help her . . . ." *Id.* at 22.). Nurse Hedrick, though, was "rude and disrespectful" to Dr. Holder, telling her she "must be stupid to think that documentation would not be necessary" for taking time off to get migraine treatments. (Holder aff. ¶ 50; Doc. 43-12 pg. 56). When the call ended, Nurse Hedrick initiated an investigation into whether Dr. Holder could to safely and effectively perform her job duties. (Schwoeble at 30, 81; Hedrick at 52-53; 72-73).[9]

Pursuant to the hospital's Fitness for Duty policy, Dr. Hudgins observed Dr. Holder at work. (Doc. 43-14 pg. 13; Boyd at 24, 33, 35). He reported to Nurse Hedrick and others that Dr. Holder was fit, lucid and ready for surgery the next day. (Doc. 43-13 pg. 1; Doc. 43-12 pg. 47; Hudgins at 45, 46; Hedrick at 49-50; Cohen at 166; Boyd at 33-35). As a result, CHMCA had no

---

[9] Nurse Hedrick's deposition is filed as Doc. 40-23.

lawful basis for sending Dr. Holder to a fitness for duty psychiatric evaluation. (Hedrick at 80-81; Schwoeble at 173).

The next day, CHMCA placed Dr. Holder on leave anyway, and ordered her to undergo a comprehensive psychiatric evaluation before she returned. (Doc. 43-12 pg. 54). On August 20, 2012, Nurse Hedrick and Annetta Provens, Employee Relations Manager, wrote, signed and sent a referral letter to Dr. Joel Steinberg. It described the behaviors that triggered the request. (Doc. 43-12 pg. 52). They included that:

> Several staff members have raised concerns about Dr. Holder's emotional state and believe that this could endanger patients. It has been reported that she has had inappropriate outbursts toward the staff, crying and yelling at them. Her behavior has caused stress in the department and has created a negative work environment. She has called multiple coworkers and managers 'incompetent,' and 'idiots' and appears to be unhappy and angry much of the time.

(*Id.*). No one knows who observed these behaviors.[10] Their report is false. Dr. Steinberg concluded as much when he reported, on August 27, 2012, that "[t]here is a marked difference between what was reported to you, Ms. Provens and Ms. Hedrick, and what Dr. Holder reported to me. I found her reports to be believable. I cannot account for the discrepancy in the reports." (Doc. 43-13 pg. 28). Dr. Steinberg further reported Dr. Holder was competent to perform her job and had no evidence of an illness or condition that could interfere with her ability to safely practice medicine. (*Id.* pgs. 28-29). Finally, he shared his belief that Dr. Holder "will be a credit to your hospital and perhaps, will bring fame to Akron for her work." (*Id.* pg. 29).

---

[10]     Neither Nurse Hedrick nor Ms. Provens had any first-hand knowledge of the referral letter details (Hedrick dep. 31; Provens dep. 47-48). Nurse Hedrick testified that she learned it from Ms. Provens, who swore she learned it from Ms. Gavriloff. (Hedrick dep. 31; Provens dep. 48-49). But Ms. Gavriloff denied any role in in the decision to put Dr. Holder require a psychiatric examination, claimed she "didn't have any part in writing" the referral letter, could not recall reporting any of the referral letter details to Nurse Hedrick or Ms. Provens and did not believe, herself, that Dr. Holder presented a danger to patients Gavriloff dep. 154-55, 160, 161-165).

Even though completely fit for duty on August 27, 2012, CHMCA did not return her to work until September 17, 2012. (Holder aff. ¶ 53). While on leave, CHMCA i) ordered Dr. Holder off of ACH premises, ii) barred her from following her patients or speaking with families, including the first surgical patient, iii) informed Dr. Holder's patients that she would not be returning to work; iv) referred her patients to other CHMCA physicians, v) removed Dr. Holder from the Neurology Department emails and vi) removed Dr. Holder's picture and profile from the NDSC website page. (Holder aff. ¶ 54).

When CHMCA finally allowed Dr. Holder to resume caring for children with epilepsy, Dr. Hudgins and Ms. Gavriloff continued to portray her falsely as "unhappy" and unable to get along with others. On October 9, 2012, for example, a scheduling "disaster" occurred that had Dr. Holder in two places at one time. (Holder aff. ¶ 56). Although Dr. Holder handled it professionally, Dr. Hudgins told her "they" thought she would "blow up" over it, since he had seen "a flurry of emails" she had sent. (Doc. 43-15 at min. 24:40). Dr. Holder wondered how Dr. Hudgins could have seen her emails, since she had not sent them to him. Dr. Hudgins explained, "[t]hings ripple out.  I mean, I got them. * * * Things ripple out. That's the way life is.  That's the way people do things."  (Doc. 43-15 at min. 24:57).

Things rippled out again on November 5 and 6, 2012, when Ms. Gavriloff sent Dr. Hudgins reports of a complaint about Dr. Holder that she knew to be false, and about a conversation in which she falsely portrayed Dr. Holder as "very teary about it" and not wanting "to get in trouble over this." (Doc. 43-16 pg. 2). Dr. Holder recorded this conversation. The recording reveals that Ms. Gavriloff actually assured Dr. Holder that she knew the complaint was false, and they both laughed. (Doc. 43-17). This false report not only rippled out, but up, to Craig

13

McGhee and Grace Walkulchik, Vice President of Operations. (Doc. 43-18 pg. 17 (Dr. Holder "self reported her interaction with a staff member to Carrie.").

On March 19, 2013, while Dr. Holder was on a medical leave, she formally complained, through counsel, about CHMCA unlawful treatment of her, and demanded that it stop. On April 12, 2013, CHMCA informed Dr. Holder that CHMCA would not permit Dr. Holder to return to work. (Holder aff. ¶ 64) Despite statutory and contractual obligations to notify her patients of her termination, CHMCA never did so. (ORC § 4731.228; Doc. 39-3 pg. 12). Instead, CHMCA informed staff, physicians, Dr. Holder's patients and their families that Dr. Holder had not returned from medical leave, and that they did not know when she would do so. (Holder aff ¶ 66; Doc. 40-9 pgs. 82-84, 89-90, 101-02, 105, 117). CHMCA continuously published in the "Daily Buzz" portion of the employee newsletter that Dr. Holder was "ill" even after CHMCA knew she had moved to Los Angeles to work there. (Holder aff. ¶ 68 and Ex. 1).

**Law**

### Dr. Holder is a Qualified Individual who Safely Performed all Essential Functions

CHMCA's seeks summary judgment on Dr. Holder's ADA failure to accommodate claim on the ground that Dr. Holder was not qualified to perform the duties for which she was hired. A reasonable jury can conclude that CHMCA hired her to build a surgical epilepsy program with an epilepsy monitoring unit at CHMCA, and that she did so. (Doc. 39-3 pgs. 15, 23 and 29; Hudgins at 23, 126; Cohen at 62, 102). This Court therefore cannot summarily judge that Dr. Holder was not a "qualified individual." 42 USC § 12111(8).

CHMCA does not dispute that it hired Dr. Holder to build a surgical epilepsy program at CHMCA, or that she did so with great success. Instead, CHMCA conflates coverage at night of General Neurology service call (GN Call), for which Dr. Holder sought an accommodation, with

14

that of the Epilepsy Monitoring Unit (EMU), for which she did not. CHMCA then dubs this conflated GN/EMU call concept "call at night," and uses the term 36 times to argue that "call at night was an essential function," that Dr. Holder "could not take call at night without serious risk to her health," and "thus, she was not a qualified individual with a disability." (Doc. 39 at pgs. 3, 5, 7-13).

GN Call covers 372 hospital beds, and CHMCA does not employ neurology residents to take first call at night. (Holder aff. ¶ 20). GN call is typically interrupted every hour of the night (DOC. 39-7 pg. 4; Doc. 43-8 pg. 68; Holder at 109). As a result, GN call is "significantly more stressful and more involved than the EMU." (Hudgins at 118). In contrast, the EMU call covers only four beds. (Holder aff. ¶ 28; Hudgins at 121-122). There, "the number of phone calls (was) tremendously less." (*Id.*). While Dr. Holder asked Dr. Cohen to assign other neurologist to the nights she was scheduled for GN Call, she did not seek, and did not need, to be excused from covering the EMU at night. (Holder aff ¶ 26-27). Importantly, Dr. Holder safely covered the EMU at night throughout her employment. (Holder aff ¶ 27-28). She did so without constant interruptions to her sleep, and without aggravating her JME, especially after CHMCA provided the promised nurse practitioner support (*Id.*).

CHMCA contends that Dr. Holder's coverage of the EMU at night aggravated her JME and "got (her) very sick." (Doc. 39 pg. 5). This blinks at reality. Dr. Holder was treating for migraine headaches in August of 2012, not JME seizures related to sleep deprivation. (Doc. 39-4 pg. 25-26, 59-107,162-169; Doc. 43-7 pg. 23, "world's worst migraine"). In addition, Dr. Holder treated her migraine condition successfully. Her treating physician, Dr. Kreigler, released her to full duty on August 16, 2012. (Doc. 39-4 pg. 147). Since Dr. Holder could and did take EMU call, and she did so without risking her health, she was able to perform that function of her job.

15

She was therefore qualified with respect to performing EMU call at night. 42 USC § 12111(8). This leaves only night coverage of GN call.

CHMCA does not claim that performing GN call at night, by itself, was an essential function, and for good reason. It was not. A function may be essential if:

1. the reason the position exists is to perform that function;

2. there is a limited number of employees available among whom the performance of that job function can be distributed; and/or

3. the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 CFR 1630.2(n). Evidence of whether a particular function is essential includes the employer's judgment as to which functions are essential, written job descriptions, the amount of time spent on the job performing the function, the consequences of not requiring the incumbent to perform the function, the work experience of past incumbents in the job; and/or the current work experience of incumbents in similar jobs. (*Id.*) On each of these tests, GN call at night was not an essential function of Dr. Holder's job.

Dr. Holder's job did not exist to perform GN call coverage at night. 29 CFR 1630.2(n)(2)(i). Dr. Hudgins testified that, had CHMCA known that Dr. Holder could not cover GN call at night, "we would have hired her regardless." (Hudgins at 125; *See also* Schwoeble at 137). "It is just that we would have hired her because we needed an epileptologist, and she was a great one. Is a great one." (Hudgins at 126). Similarly, covering GN call is not so highly specialized that CHMCA hired her to perform just that particular function. (*Id.*); 29 CFR 1630.2(n)(2)(iii). As for the number of employees who could perform GN call at night, CHMCA employed eight other neurologists, which is "the envy of any program." (Doc 39 pg. 2; Doc. 43-7 pg. 7; Cohen at 122-123). Dr. Cohen testified that eight neurologist was "beautiful," since a four

16

or five neurologist rotation would result in double the GN call responsibilities. (Cohen at 123).

As for the work experience of current and past incumbents in the job, when Dr. Holder arrived, she increased the number of neurologists to nine, which was even better than the beautiful eight. (Doc 39 pg. 2). Taking Dr. Holder off the GN schedule at night left the GN call schedule in a better than beautiful condition during the days, and returned the other neurologists to the enviable, eight neurologist rotation at night.

CHMCA did not, in its judgment, consider GN call at night essential. When Dr. Holder told Dr. Cohen that constant interruptions to her sleep aggravated her JME seizures, Dr. Cohen readily authored an admirable plan to assign other neurologists to her GN call nights. Mr. Schwoeble and Dr. Hudgins approved it. As for Dr. Holder's job description, it and her bonus formula called for her to "**[p]articipate** with other physicians and providers in clinical coverage for Children's Neurology patients." (Doc. 39-3 pgs. 21, 29; emphasis added). Similarly, her performance appraisal says she should "work in cooperation with clinical faculty to provide **equitable** call coverage. (Doc 39-3 pg. 27; emphasis added).

General neurology service runs 24/7. Dr. Holder performed her GN service as scheduled, with the exception of nights. (Holder aff. ¶ 24). When Dr. Cohen agreed to assign other neurologists to cover her GN call at nights as an accommodation, he *increased* Dr. Holder's GN service weekend coverage. (Doc. 39-7 pgs. 2, 8 and 14; Holder aff. ¶ 24). Dr. Holder thus *participated* with other physicians (and later on providers) in *equitable* call coverage. Finally, nowhere is "night call," by itself, identified as a function, much less an essential one. For these reasons, the performance of GN call at night, by itself, was not an essential function.

**CHMCA did not provide any Reasonable Accommodation**

Dr. Holder's request for an accommodation triggered the accommodation process under 29 CFR 1630.2(o). The accommodation process "determine(s) the appropriate reasonable accommodation" through "an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 CFR 1630.2(o)(3) (*See also* Schwoeble at 23-24). In this case, Dr. Holder, Dr. Cohen, Dr. Hudgins and Mr. Schwoeble engaged in that process and agreed upon Dr. Cohen's admirable plan. (Schwoeble at 132-134, 146-147,149).

Dr. Cohen did not put that plan in place. Instead, he left Dr. Holder on the GN call schedule at night and asked volunteers to sign up for her. Dr. Cohen did not interact with Dr. Holder on this change, or obtain the approvals of Dr. Holder, Mr. Schwoeble or Dr. Hudgins. (Schwoeble at 221-222; Cohen at 240). Mr. Schwoeble, who was not aware that Dr. Cohen had deviated from the approved plan, testified that making Dr. Holder to ask others to volunteer "wouldn't have been the way that I would have done it." (Schwoeble at 222). Further, since neurologists were already free to swap shifts, Mr. Schwoeble agreed that making Dr. Holder find volunteers was "no accommodation at all." (Holder aff. ¶ 36; Schwoeble at 222). While Mr. Schwoeble hypothesized that, if "Dr. Cohen would have taken that call . . . or would delegate that to someone else," CHMCA might have reasonably accommodated Dr. Holder's JME seizure aggravation. (Schwoeble at 222-23), Dr. Holder denies that Dr. Cohen did that. She "continued to cover call or have to ask people to cover for me for a period of time, quite a long period of time." (Holder at 114). During that time, Dr. Holder "either took it or I asked somebody to cover for me. It wasn't determined by (Dr. Cohen)."

18

GN call night coverage was thus "out of my control." (Holder at 145). People could and did say "no." (*Id.*). If no one volunteered, Dr. Holder would have to take the call herself. (Holder at 167-169; Schwoeble at 224 ("it is not an option not to have a neurologist on night call")).

Forcing Dr. Holder to constantly find someone to cover her nights also subjected her to ridicule and scorn. In December, for example, the other CHMCA neurologists organized a departmental meeting in Dr. Holder's absence and demanded compensation for their increased workload as a result of the physician who "refused to take night call." (Holder aff. ¶ 35). Her colleagues routinely commented along the lines of, "well, at least you slept all night" and "night call was hard, but you wouldn't know." (Holder aff. ¶ 35). As late as January 28, 2013, the secretary who handled the call schedules wrote derisively to President and CEO Bill Considine's Administrative Assistant that Dr. Holder "isn't to take night call anymore and was wanting that removed. BABY!" (Doc. 43-20 pg. 1-2).

Since CHMCA discarded the plan it reached through the accommodation process, and because the alternative, forcing Dr. Holder to find someone to take GN call at night for her was no accommodation at all, reasonable jurors can conclude that CHMCA did not reasonably accommodate Dr. Holder's JME seizure condition. Dr. Holder therefore respectfully requests the Court to deny summary judgment on her failure to accommodate claim.

### CHMCA placed Dr. Holder in a False Light that would be Highly Offensive to Reasonable People

In Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the

publicized matter and the false light in which the other would be placed. *Welling v. Weinfeld,*

113 Ohio St. 3d 464, 473 (Ohio 2007). "'Publicity," means that the matter "is made public, by

communicating it to the public at large, or to so many persons that the matter must be regarded

as substantially certain to become one of public knowledge." *Id.* at 471.  The means of

communication "may be oral, written or by any other means." *Id.* The test is whether the

communication **"**reaches, or is sure to reach, the public." *Id.* 471-72.

The public is not necessarily the public at large, but includes a "public" with whom the

plaintiff had a special relationship. *Miller v. Motorola, Inc.,* 202 Ill.App.3d 976, 980-81, 560

N.E.2d 900, 148 Ill. Dec. 303 (1st Dist. 1990). In *Miller,* the court adopted the view expressed

in *Beaumont v. Brown,* 401 Mich. 80, 104-05, 257 N.W.2d 522 (1977):

> An invasion of a plaintiff's right to privacy is important if it exposes private facts
> to a public whose knowledge of those facts would be embarrassing to the plaintiff.
> Such a public might be the general public if the person were a public figure, or a
> particular public such as *fellow employees,* club members, church members,
> family or neighbors, if the person were not a public figure.
> Although *Miller* involved the tort of public disclosure of private facts, its
> reasoning was later adopted and applied to allegations of false light.

*Moriarty v. Dyson, Inc*., 2010 U.S. Dist. LEXIS 68402, 14-15 (N.D. Ill. July 8, 2010)(emphasis

in original).  *See also Johnson v. J.B. Hunt Transp., Inc.,* 2009 U.S. Dist. LEXIS 116962, 3

(N.D. Ohio Nov. 30, 2009) (statements made to "employees, law enforcement officials,

customers, supplier and vendors with whom Plaintiff was familiar and dealt with in his career.");

*Blatnik v. Dennison,* 148 Ohio App. 3d 494, 498 (Ohio Ct. App., Lake County 2002)

(defamatory comment published to employees and co-workers).

In this case, CHMCA repeatedly made false statements to CHMCA executive leadership,

Dr. Holder's co-workers, her patients, their families, members of the national medical epilepsy

community and Dr. Holder's past and current employers. CHMCA did so knowing the

statements were false, or in reckless disregard of their falsity. They cast Dr. Holder in the false light of a physician who cried, yelled, had inappropriate outbursts, was unhappy most of the time and needed psychiatric help.

CHMCA gave publicity to this false light with written communications and oral conversations. These "rippled out" to the highest levels of executive leadership. By the time of her termination, for example, Mr. Considine and Mr. Lyden, who had only professional interactions with Dr. Holder, learned that she had "her moods." (Considine at 61) and did not get along with the people with whom she worked. (Lyden at 44-45, 54). Once it terminated her employment, CHMCA cast Dr. Holder in the false light of a doctor who was too ill to work. It publicized this message in print in the Daily Buzz, and orally to Dr. Holder's patients, which it noted it in their EPIC charts. CHMCA reinforced this publication by **not** notifying patients that Dr. Holder was alive and well after it terminated her, as required by Ohio law and its contract with Dr. Holder *See* ORC § 4731.228; Doc. 39-3 pg. 12. This message traveled across the country. Some of its recipients thought Dr. Holder was dying. Finally, CHMCA publicized to every hospital where she worked, both currently and in the past, that she had filed suit against it for something having to do with discipline, coaching, her termination and medical restrictions on her ability to work. All of this is highly offensive to reasonable people, especially those in Dr. Holder's shoes.

### CHMCA Breached Dr. Holder's Employment Agreement, Causing Harm

Dr. Holder has sufficient evidence to establish her breach of contract. Her contract exists (the Employment Agreement), Dr. Holder fulfilled her obligation under it, CHMCA failed to fulfill its obligations and damages resulted from this failure. *Doe. v. Sexsearch.com*, 551 F.3d

412, 416 (6th Cir.2008).  CHMCA failed to fulfill its obligations under the agreement to, among

other things, provide NP support, and to notify Dr. Holder's patients of her termination.

For six of the seven months after the EMU opened, CHMCA failed to provide NP

support during the day and at night. This placed an overwhelming burden on Dr. Holder. She

shouldered it for months, suffering harm. Finally, she demanded that CHMCA remedy the

breach on August 6, 2012 (Doc. 43-6 pg. 92).  When she did so, CHMCA included her complaint

about "an unfair workload" in the psychiatric referral letter, causing her more harm.

CHMCA also breached also Dr. Holder's contract by failing to notify her patients of her

termination. Dr. Holder's agreement requires that:

> Upon termination of the Agreement for any reason, CHILDREN'S will send to
> patients then under the care of the PHYSICIAN, to referring physicians and to
> third party payors a mutually agreed upon letter advising them of PHYSICIAN'S
> departure.

(Doc. 39-3 pg. 12). CHMCA notified Dr. Holder of her termination through counsel on April 12,

2013, and again on May 2, 2012 (Holder aff. ¶ 64; Doc. 43-22). On April 12, 2012, CHMCA

turned off Dr. Holder's badge and ordered Dr. Holder not to return to its premises. CHMCA

deactivated Dr. Holder's ID badge, severed her access to her work computer, and informed her

attorney that she needed a hospital escort to return to her office to collect her belonging. (Holder

aff. ¶ 64). Although CHMCA thus terminated Dr. Holder, it did not notify her patients. This

breach took place at the same CHMCA was portraying Dr. Holder in the false light of a

physician who was too ill to practice.

Failing to perform an obligation to publish a message publicizes the inference drawn

from the absence of that message. Here, the inference was that Dr. Holder was too ill to practice

medicine. CHMCA's breach of its obligation to notify patients reinforced and magnified that message, causing her greater harm than would have occurred absent the breach.

### The Types of Damages available and whether Caps apply are Matters of Law

While CHMCA may, for good reason, expect the jury in this matter to return sizeable verdicts against it, no jury has done so thus far. Whether caps apply to them is thus purely a question of law that is not yet ripe. Further, whether or not Dr. Holder is entitled to emotional pain and suffering damages under her federal ADA claim is not a necessary element of that claim. Therefore, it too is not appropriate for decision pursuant to Rule 56. Should this Court choose to issue an advisory opinion on such damage questions, though, Dr. Holder respectfully requests the opportunity to brief the issues before it does so.

### Conclusion

Dr. Holder has sufficient evidence going to each element of every claim from which a reasonable jury can find in her favor on each of them. She therefore respectfully requests that the Court deny CHMCA's partial motion for summary judgment in its entirety.

Respectfully submitted,


/s/ Neil Klingshirn
Neil E. Klingshirn  #0037158
FORTNEY & KLINGSHIRN
4040 Embassy Parkway
Suite 280
Akron, Ohio  44333
(330) 665-5445

Attorneys for Deborah Holder, M.D.

23

CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2015, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court 's electronic filing system. Parties may access this filing through the Court's system.

/s/ Neil Klingshirn<br>
Neil E. Klingshirn